All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and his Honorable Court. Good afternoon everyone. The case before us is number 02, showing when it started. 1052 Integra LifeSciences v. Merck on remand from the United States Supreme Court is there. May it please the Court. The Solicitor General, speaking for the FDA in this case last year, had opined that many, if not all, of the accused experiments, and I'm quoting from S. 270, many, if not all, of the accused experiments are protected by the FDA exemption if the proper legal standard is applied. But wasn't that because the experiments that were before the FDA, and therefore considered by the Solicitor General, were themselves at a certain stage of development? No, Your Honor. The Solicitor General was addressing the very experiments accused of infringement here, not the later filed submission by the National Cancer Institute. So it did enter the case to apply all these accused experiments from 1995 through 1998. I agree, but we need to nevertheless have in mind, do we not, just what those experiments were, remembering that the synthesis of most, if not all of it, of the compounds at issue was not done within the United States, and a number of other of the, I'll call them preliminary stages, without putting any weight on what's preliminary, was not really at issue in this case, is it? That is right. All of the preliminary, very early research of Dr. Cherish and research at Merck was not in the case. This all was focused on preclinical experiments done at Scripps, long after Dr. Cherish had discovered with his antibody that if you block a certain receptor, you can inhibit angiogenesis. What do you mean by preclinical? Before the drug is put into humans in clinical trials, the preclinical phase is understood to be that period of time when efficacy, mechanism of action, pharmacology, and safety are demonstrated in animals, and that's what I'm referring to, Your Honor. Okay, now I have a patent on something called the OncoMouse that I developed at Harvard as a researcher there, at the cost of many millions, maybe even billions of dollars of my university and funders. How does that OncoMouse get protection under the way you read the Supreme Court's decision? Well, the Supreme Court decision doesn't really reach, I think, specifically what you're bringing up. Yes, it does. It reaches it specifically. Tell me how you're going to deal with the OncoMouse. You at Merck, you're Merck, and you now are developing a drug for breast cancer, and you, of course, are going to test it on what? My OncoMouse. Now tell me what our negotiations are going to be like. Well, Your Honor, at that stage, the OncoMouse is not, as it was here, the compound. The patent there is on the mouse, not the compound, and so you're using the patented invention not to study the patented invention. You are using it as a tool to show how well your drug is working, and so that's a very different situation from what we have here. In that instance, you would say the OncoMouse has full protection of the patent act, and you would be paying me royalties. Is that right? Well, it's… And we would negotiate the royalty amount? Well, I believe that both from the perspective of the Solicitor General's brief and… I'm asking you what Merck thinks. Your Honor, I have to admit Merck has not taken a position on that. Merck's got to have a position on that. That's the central issue we're going to be dealing with here. Well, Your Honor, I respectfully dissent because the Supreme Court, the Solicitor General, and even Integra have all said that the compounds being used here were not used as research tools. The compounds may not. There were a few methods. There are four patents. One is a receptor. How is a receptor that measures this peptide activity, and how is the method of detecting the peptide activity? How are those compounds? Well, the receptor is a compound. It is a protein. It is a patent. There were two experiments at issue here that involved the receptor. Well, let's not go into this case. Just stick with my oncomouse. Well, Your Honor, I've only got ten more minutes to talk to you. And you're going to spend them on this issue, so you might as well get used to it. All right, Your Honor. In that case, the oncomouse, in my view, the oncomouse is a research tool, and the Supreme Court's language about use of a patented compound to produce data that would be appropriate to give to the FDA is really not addressed there because the tool— So you would support the decision of this Court, which remands to the District Court, to ascertain which, if any, of these patents are research tools? No, Your Honor, because Integra has absolutely waived that argument. It has never at any phase in this case, including the Supreme Court when asked directly, it has never made the argument and it introduced no evidence whatsoever about the research tool issue. There's no research tool exemption. You and I know that. There never has been. There was nothing for them to raise an issue about. So until the footnote 8 in the Supreme Court's opinion, you did not have a research tool exemption. Now, apparently, under the footnote, we've got one. Maybe it's footnote 7. Excuse me. Yes, 7. I'm off one. Now we've got something to worry about. Tell me what we do with that. Well, Your Honor, of course it is appropriate if this panel wants to remand to the District Court to consider this because the District Court's denial of JMLL was based on three grounds that the Supreme Court has ruled are legally insufficient. So it would be appropriate to remand. But the problem with remanding and asking the District Judge are these research tools or not is there is no record on which the judge could base that decision because— He'll have to make a record. That's why you remand to a court is to give them a chance to do whatever they need to do to build the record to make the decision. The Supreme Court has given us a new question, which we never had to ask before. Is it a research tool? Now we have to ask that question. It's only appropriate to build the record on which to make the decision, right? Well, again, Your Honor, we would contend that Integra, having never argued that the FDA exemption— What would they have argued before? There was no research tool exemption. Your Honor, they would have argued that we had not met our burden of proof because the patented inventions were research tools. Here, the 525 patent was on the compound itself. There were two methods patents, which were methods of using the compound— I'm with you on 525. Talk to me about 734, a cell surface receptor. That's something you experiment with, right? You decide whether or not it is receiving or not. It is a molecule found in the body that is in the pathway of this disease. It goes on to talk about capable of binding, classic tool. What compounds bind to that receptor? The one in issue, the compounds included antibodies and peptides and memetics. And it is true that that receptor was used— This is the oncomouse, isn't it, or potentially. I don't have a full record to make that finding, but we should find out if this is an oncomouse. But, Your Honor, it is focusing on two experiments. There are 180, and none of the other 178 could possibly be— That may exactly be what the record is, that the damage in this case should be about that high because that's all that amounts to the research tool use. That may be exactly right. In fact, that's pretty close to what the federal circuit said the first time around. But that's for the district court to decide, right? Either the district court or this panel. But I would submit if we can just spend a few minutes on the other 178 experiments here because— Well, that's an argument for the district court, isn't it? You can tell them that the 178 were fully within the exemption as defined by the Supreme Court and let it go at that. I certainly could, Your Honor, but I think it at least is useful. We have our time here set. It is useful to go through a few more of the arguments because this court might provide guidance to the district court if it has decided to remand on some of the other areas. Let's enlarge your time by a few minutes, and please go through these other points as well. All right. I'd like to address the argument that Integra has raised about the memetics. There are a number of the chitcan assays. Now, chitcan, that's where you've got a chicken egg with a membrane, and you count how many blood vessels grow in response to a cytokine and then inhibit that angiogenesis with a compound. It is argued for the first time on remand that those studies should not be exempt. Why? Because Merck didn't know enough about the memetics to know what it was testing, that it was just a search for some sort of new drug. But, in fact, the record makes very clear through the testimony of Dr. Goodman and through the contract between the parties that all of the memetics that were being tested head-to-head with the peptides, those memetics were known to already have interacted and bound tightly to the receptor. They were antagonists of the receptor. That was known by Merck. And so at the time that the chitcan experiments were carried out, Merck knew exactly that it was comparing two effective receptor antagonists to see which was the better candidate. And under the Supreme Court ruling, that by law is subject to the FDA exemption. It is perfectly appropriate to take your lead candidate, EMDA, and test it against a memetic. And so I would submit there's really nothing for the district court to decide about the memetic studies. There is also the brief really ignores the rabbit and the mice assays. These high-level assays where animals were caused to get a disease. Well, because they're more traditional. I think you don't have to pursue those here either because mice and rabbits are more traditionally preclinical, pre-human subjects, are they not? And the results thereof invariably, I think, have to be provided to the FDA. Is that correct? Whether they're positive or negative? Yes. It is expected that all of these animal experiments, including the chitcan, will be provided to the FDA. But you're right. In the course of a preclinical study, you get increasingly complex and higher-level animals to demonstrate the efficacy and the safety. And here, I don't believe there's anything to remand to the district court where you're talking about the mice and the rabbit assays. The record is clear. There is no testimony that those assays did not contribute data on efficacy, pharmacology, and mechanism of action. And the Supreme Court has said those are categories that matter to the FDA. So have you formulated where there might be a sufficiently clearly defined line to be drawn between the kinds of results, the kinds of data, the kind of research that would be plainly preclinical within the scope of the statute, and that which would not, and that which is in some sort of gray area? Well, Your Honor, the Supreme Court did that for us. I don't think so. And it drew the line at the time frame where the drugmaker has a reasonable basis for believing that the compound may work through a particular biological process to produce a particular physiological effect. That's not a very bright line, is it? Oh, in this case, it's extremely bright. We know that that is no later than January of 1994. We know that that line cannot be any later than that because by then, Dr. Cherish had taken his antibody that he knew blocked the receptor, and he demonstrated that that antibody inhibited angiogenesis in the chick cam. When he then took one of the Merck peptides and repeated that experiment, Merck reasonably believed that the peptide had a particular biological process. It would bind to the receptor, and it would produce a particular physiological effect. It would inhibit angiogenesis and thereby either starve a tumor, cure eye disease, or cure arthritis. So in this case, the line is very easy to draw and very bright. I see I'm running well into my time. Could I get some indication of time? Yes, we will enlarge your time by a few minutes. If there's anything else you want to tell us in your argument in chief. Let me then turn to the focus of the Integra brief, which is the chick cam and in vivo assays. Integra argues for the first time in its remand brief that the jury could conclude that those assays, chick cam and in vitro, are not sufficiently predictive of efficacy in humans, and therefore the jury verdict could be sustained as to those assays. It does sound like a jury question, doesn't it? Well, it would have been a jury question if there had been any testimony whatsoever. But Integra, recall, had one focus at trial. It came in to say the FDA does not care anything about efficacy, mechanism of action, or pharmacology. It cares about safety and only safety. And so it did not bring in a single witness to say, by the way, that chick cam assay really doesn't tell you anything about efficacy in humans. It called no witness whatsoever. So it cannot be a jury issue where the plaintiff has submitted no evidence whatsoever. The defendant has submitted the evidence of totally unaligned witnesses, like Dr. Houston. He was not an employee of either party. He testified with the excess ID. You're breaking it down as to which experiments might have generated information that would go to the FDA. Can we look at it in terms of which patents are incapable of offending the exemption because they are research tools? No, Your Honor. There's really nothing about a patent that labels it a research tool patent or not. But the Supreme Court has told us that research tools aren't something within the exemption. Why can't we deal with that? Well, no, the Supreme Court said that it didn't have to reach that issue. It has not ruled on it yet. Because there was, of course, no issue to reach before. They said, well, the Integra hadn't raised the issue. But, of course, there was no issue to raise until now. Now we have the issue. Well, in any event, the statute exempts uses. It doesn't exempt patents. So I do not believe that we can now go- Uses of what? Patented inventions. Ah, uses of patents. Yes. That's what I'm wondering. Why don't we look at the patents? Because the patents cross over the experiments. For example, the Chitkin assay- And using that tool as a tool, not to improve the tool, according to the clinical trial studies of the European courts, an excellent distinction perhaps to be adopted by US law as well. Are you familiar with these? I am not, Your Honor. Okay. The problem with trying to unremand, divided up patent by patent, as I was saying, the ChitCam experiments, for example, implicate three of the patents. And there's no testimony at trial that would support any other division of this experimental program other than by the type of assay at issue. That's how the case was litigated, and that's how the evidence entered. So just to finish up on the notion that it's a jury question as to whether ChitCam assays produce data relating to efficacy, Integra adduced no testimony on that point. It asked the jury to ignore that entirely. Merck brought in Dr. Houston, and Dr. Houston was a fact witness. He had helped prepare the ICSIS-IND. The ICSIS-IND contained ChitCam data, Alpha-B Beta-3 receptor studies, cell adhesion studies, the exact same studies done with the peptide, just done with an antibody antagonist. And he explained to the jury why each of those experiments sheds light on efficacy. And under the case law, under Rule 50, the jury cannot reject the testimony of a disinterested witness when he was not even cross-examined. Can you find in the record where it says which experiments would infringe which claims? In the record, that would be the testimony by the plaintiffs of Dr. Deddar. So we can identify which claims were infringed by which, or not infringed, if there's an exemption, by which experiments? That is correct, Your Honor. Well, let's hear from the other side, and we'll save your rebuttal time as well. Thank you. Mr. Flores. May it please the Court, there are three points I would like to make. The first point has to do with the law that governs this Court's decision here, and that's the law about how courts review jury verdicts under Rule 50. And it's a very simple principle. This jury verdict cannot be overturned unless there is evidence that the jury was required to believe that it's inconsistent with the verdict. On the premise that the Supreme Court did endorse the jury instruction. That's exactly right, Your Honor. Exactly right. And I also would point out that in the last paragraph of the Supreme Court's opinion, they expressly quote the form of verdict. And I believe fairly read, the mandate in that last paragraph of the Supreme Court's opinion asked this Court to review under Rule 50, applying the jury instruction and the form of verdict. And the governing principle here is simply this. The operative question is this. Was the jury required to believe the witnesses put forth by Scripps and Merckx? But there was also, the jury was also required to believe that it would indeed, in fact, or in law, be infringement at the, I'll call it the preclinical stage, the experiments that we're now talking about. That is before those that were necessarily or required to be provided to the FDA. The jury, I'm not sure I understand Your Honor's question. The jury did found that these experiments infringed the claims. Yes, on the basis that it was infringement because the data did not come under the statutory exemption for data submitted to the FDA. That's right. And Merckx had the burden of proving to the contrary. They had the burden of both coming forward with evidence and the burden of persuasion. So the operative question for this Court is, was the jury required to believe any of the testimony put forth by the witnesses relied upon by Merckx? And if so, does that testimony that it was required to believe compel this Court to overturn the judge's verdict? There was no question or there's no question now. Perhaps there was a question then, but I gather there was no question at all as to whether the chick embryo data were, in fact, relevant to the FDA submission. There was indeed a question about that trial. Entire argued very hard at the jury that they do not. But that's the kind of question I think the Supreme Court resolved. By moving back the boundary of the data, which would be relevant to FDA approval. With respect, Your Honor, I do not believe the Supreme Court resolved that question because the issue about whether or not the jury was required to believe any of the testimony about the chick cam assays was not decided by the Supreme Court. In fact, that's exactly what the Supreme Court sent back down to this case for review under Rule 50. Well, then here we are. Here we are. Now the answer I suggest to Your Honor that the answer is not that difficult. If you look at the evidence that we put forth in the brief and go down the witnesses, they were not required to believe these witnesses. Dr. Cherish was impeached. Not one, but two federal district judges, Judge Keat in denying Merck's motion for summary judgment and Judge Fitzgerald in denying Merck's motion for judgment as a matter of law at the end of the trial. Both of those judges found that there were significant credibility issues with Dr. Cherish's testimony and the jury was not required to believe him. What does that have to do with whether the chick cam data are sufficiently close or if in fact included with submissions to the FDA, therefore to come within the statute? Because it was Dr. Cherish's testimony that supported Merck's argument that the chick cam assays give rise to inferences that are relevant to the FDA. They rely on Dr. Cherish's testimony for that. But if in fact the ICSIS data included the chick cam submissions, if in fact such data were submitted by Merck, you're saying that that can't be considered? Well, let's separate the witnesses. Dr. Cherish's testimony is not available to Merck to support this verdict. Let's talk about Dr. Houston. Ms. Thayer just said Dr. Houston was an interested witness. He was a fact witness, not an expert. Dr. Houston testified about the ICSIS-IND. The ICSIS-IND had to do with a biologic, not a drug. It had to do with an antibond, not RGD peptides. He never testified directly about RGD peptides. His fact knowledge didn't encompass that. He talked about what was submitted in support of the ICSIS-IND, which was not only for a different entity, it was for a different kind of entity, for a biologic, not a drug. Dr. Houston's testimony won't sustain that. And particularly, even if it can be considered, this testimony that the jury was entitled to rely on to the effect that chit-cam assays are not available to support inferences about what goes on in the human body. Mr. Meyer testified to that, and Merck's own witnesses testified to that. Dr. Janczuk said the same thing. So if you look at the evidence, and you look at the witnesses upon which they can rely, there's simply no evidence that compels this court, that allows this court to overturn the jury's rational verdict that the chit-cam assays were not related to. But you're saying as a matter of law, there's a line between chick embryos and mice, for instance. Well, not for instance, but specifically to this case, as to what sorts of data would come under the exemption because they would or would not be of interest to the FDA. No, Your Honor, I don't say that as a matter of law. I say that as a matter of disputed fact, which was decided by the jury based on its assessment of the credibility of the witnesses and the weight of the evidence. And I say further that based on the contradictions in Dr. Cherish's testimony and the limited nature of Dr. Houston's testimony, the fact that Dr. Houston's testimony was contradicted by Mr. Meyer and Merck's own Dr. Janczuk. You're really saying that the Supreme Court decided a non-issue, but I have the perception that this particular issue was quite precisely joined before the court and, in fact, before us. We've got a new test now. It's called the objective drug-maker test. None of these people testified on that basis, did they? They didn't testify on – well, Your Honor, actually, I disagree. You think they – all the witnesses understood the intricacies of the Supreme Court's new standard and testified precisely with that in mind? I don't think they need to testify precisely with that in mind. These are fact witnesses. And what their understanding was of the law should have no impact on their testimony about what inferences can legitimately be drawn from these experiments. They testified to that as scientists. They shouldn't be shading their testimony to conform to the parties' positions on the law. And the test that the Supreme Court articulated – The Supreme Court has said the new reasonably related test is broad enough to leave adequate space for experimentation and failure on the road to regulatory approval. That's correct, Your Honor. The Supreme Court also said – We were doing this experiment regardless of success or failure, and we knew that it was within the exemption or without. They were testifying, Your Honor, as to what inferences can legitimately be drawn from these experiments, what was reasonable for them to believe. And there was disputed testimony about that because Mr. Meyer and Mr. Janczyk both said that chicken – Mr. Meyer said chicken data doesn't tell us anything about what goes on in the human body. And that won't support inferences about safety, and by extension, it won't support inferences about efficacy. And Dr. Janczyk confirmed that in Merck's view, this kind of chicken data wouldn't support inferences about human safety either. And on that basis, as a matter of fact, upon which the jury was entitled to rely, the jury could reasonably conclude that these tests were outside the scope of the exemption. It was a disputed factual issue. And on review at this stage, on review of a denied motion for judgment as a matter of law – Were any of the ten witnesses ever cross-examined on efficacy effects of the experiments? Well, let's talk about these ten witnesses. Yeah. There was – and by the way, Your Honor, I would refer you to page S1098, which I think is a useful guide. It was a table prepared by Merck's counsel. And they – in here, they tell us which witnesses testify as to what topic, safety, efficacy, mechanism of action for each of the 16 categories. Now, here, there's not ten witnesses listed. There's only five. And as you can see here, Dr. Cherish carries the brunt of the load here. If Dr. Cherish is not believed, if the jury wasn't required by law to believe his testimony, Merck's case falls apart. If you go on this first page, the first assays, the only support listed here by Merck is Dr. Cherish's testimony. Do you think if the jury had understood efficacy, mechanism of action, pharmacology, and pharmacokinetics to be part of the reasonably related standard, they would have made the same finding? Your Honor, I believe the jury did so understand because the jury instruction that they were given is consistent with the test adopted by the United States Supreme Court. And that's not my opinion. I do agree with it. That is what the Supreme Court said in the last paragraph of its opinion, that the instruction given to the jury is consistent with the Supreme Court's interpretation of the law. If we conclude that you don't have much left except an oncomouse type of patent, what is the effect of that on your jury verdict? If you conclude that the only argument to be made is that the patents are research tools, I think the verdict still must be sustained. Because clearly, for the reasons we put forth in our brief, about 11% of these experiments were done using the RGD peptides as controls. Controls to test for memetics in which that was discovery research. That was a different kind of use of these peptides. Discovery research, basic research, is not within the scope of the assessment. You're going to argue to me that claim 8 of 525, this is a peptide, a drug, a broad class of peptides that have a cell attachment property, that that's a research tool. It can be used. Anything can be used as a research tool, Your Honor. Understood. And that's exactly what happened here. These drug compounds were used as research tools. They were not being investigated. The properties of these compounds were not being investigated in these experiments in which I speak. In fact, they were assumed to be known. That's what a control is. They were used for discovery research to see if they could find a compound that mimics the activity of the RGD peptides. Do you agree that that's 2 out of the 180 experiments? Or would you put it more in the 10% category that you've mentioned? It's 11%, Your Honor. The parties agree on that. But if, in fact, that were something that seemed to make sense, was this argued to the Supreme Court that there was a certain small amount of activity, which was, in fact, sufficiently removed from anything that might have been viewed as submissible to the FDA, that it's in some other category, whether you call it basic research or research tool, whether there's a distinction between them, I don't know. But in any case, sufficiently removed even from the broadest view that the government was taking as to what was exempt. I believe we stated in our briefs that these peptides were used as controls. For 10% of the experiments. The Supreme Court did not discuss this issue. That issue was remanded for this court. But they seem to have been aware of it in the lines that they drew. So in any case, the damages verdict was not based on this distinction. Do you agree? No, it was not, Your Honor. You're correct. It was based on the finding that these experiments as a group, all 180 of them, do not fall within the scope of the exemption. Because that's the question the jury was asked. And again, that question, that form of verdict, was repeated. It was actually quoted by the Supreme Court in its mandate. I think that mandate, fairly read, tells this court to review under Rule 50, applying that form of verdict. And Merck has never argued that that verdict is wrong. The cavalry charge into the artillery rarely works. The Supreme Court has fired a pretty heavy volley of artillery here. Are you sure you shouldn't use your cavalry otherwise? Well, Your Honor, let me make this one last point because I think it needs to be said by us. That the form of verdict was correct and it was not contrary to the law because it reflected the way that Merck put on its evidence. Merck didn't ask for an experiment by experiment determination. It asked for a category by category determination. And there were two problems with that. First, as the district court said, look, basically the evidence was the same for all these categories. And there was no real basis for deciding differently as to them. But more importantly, there are important distinctions that we argued at trial that could lead to different decisions in truck category. The point I was making about the chick cam assays, about how a lot of them were used as controls, in which the peptides themselves were not being tested, but they were being used for discovery purposes. If the jury was asked to decide on a category by category basis, they would have been forced to ignore that critical distinction. If even on, because the Supreme Court did, what they did do is take the statutory exemption and define it broadly, more broadly than perhaps we in the courts had in the past. So from that viewpoint, there would be a different overriding premise of law before the jury than that which they had, even though the trial judges instructions were in fact repeated and supported by the Supreme Court, although the court remarked that they were somewhat broad. And the narrowing would come from the fresh look at the statutory interpretation and application, which I think you must agree pushes back in time and therefore in scope, in sweep, the experiments and the kinds of experiments that might be considered relevant to ultimate FDA registration. Do you see it that way? I agree with you, Your Honor, to a limited degree, but I don't think that makes any difference in this case. Because here we are, here this court is, on review of a denial of a JAMAL motion. And again, the operative question here, because Merck had the burden of proof. Merck had the burden of coming forward with credible witnesses. The operative question is, was the jury required to believe these witnesses? And clearly it was not. And on that grounds, this verdict should be sustained. The court doesn't have to grapple with the issues as if it were the jury. This court does not have to sit here and weigh the evidence and assess the credibility of the witnesses. In fact, the court shouldn't do that. The court should confine itself to the procedural issue at hand, the procedural issue that the Supreme Court didn't touch and sent back for this court to deal with, which is strictly the application of Rule 50 Review. Was the jury required by law to believe Dr. Cherish, to believe Mr. Bynum? And the answer to that is clearly no. Two district court judges found those credibility issues. And if you look at this table, you can see the importance of the table I referred to that begins on S. 1098. You can see how critical these witnesses are to Merck's case. If it didn't, these witnesses are it for Merck. If these witnesses are not believed, Merck has completely failed to meet its burden of proof. I think it's just that simple. And I would urge this court not to intrude into the province of the jury because the law is clear from the Supreme Court that it ought not to do so. Any more questions, Mr. Forrest? More anything else you have to tell us or must tell us? There's been a good deal of paper generated on this remand as well that I think has all the arguments in it. Yes. There is one point I'd like to reply to. And that is the issue about whether or not... Well, I won't go into that detail. But there has been arguments about waiver. And I would urge the court to look at the arguments that were made below very carefully, in particular on the J. Amal motions. I don't believe Merck's citations in the reply brief support what they say they argue. Thank you. Thank you, Mr. Forrest. Ms. Thayer, you have three minutes. With respect to required to disbelieve, I would direct the court's attention to the case law, Reeves, cited by the plaintiff, and as well to Chesapeake and Ohio Railroad v. Martin, 283 U.S. 209, that's Spring Court 1931, as applied in Quintana Roo vs. Hyundai 303 F-3rd 62, that's out of the First Circuit, 2002. In those decisions, the courts have held that where a party employee or even an expert witness testifies for the party bearing the burden of proof and are not cross-examined with respect to their testimony, the jury may not disbelieve their testimony simply because they are an employee of a party or a hired expert. So here, the jury was not permitted to discredit Dr. Houston. Dr. Armitage is another whose testimony went in unimpeached, no impeachment whatsoever, of either the generally or the specific testimony about the chit cam evidence. And on a Rule 50 motion, those witnesses' testimony must be credited. Second of all, you were told and shown S1098 and told, that's all the evidence we have. Well, excuse me, that is only one exhibit in a past motion. Our brief at pages 41 through 45 goes through methodically 10 witnesses. And Mr. Flores cannot blink that just by holding up a piece of paper and saying those same 10 didn't make it onto this chart. They are in our brief, and the citations are directly to the testimony, and there were 10 witnesses that testified, not all of them to efficacy, some of them to mechanism of action, some of them to pharmacology, but in every instance, every instance, there was a witness who testified or a document such as the Ipsos IMD that established either efficacy, pharmacology, or mechanism of action, and it only takes one to have the exemption apply. You asked, Your Honor, did the argument about the memetics, was that presented to the Supreme Court? Yes, Your Honor, it was featured very broadly by Integra, and they urged that at least as to those experiments, as they did here, they were used as positive controls, and therefore, they're outside the exemption. And the Court addressed that when it said that to construe Section 271E1, not to protect research conducted on patented compounds for which an IMD is not ultimately filed, is effectively to limit assurance of the exemption to activities necessary to seek approval of a generic drug. So they said the fact that you're going to do a comparison and ultimately that data may not be submitted to the FDA or one compound may be approved rather than the other does not avoid the exemption at all. It applies, so they did very directly address that argument. Finally, as to the purported cross-examination of Dr. Cherish, I would urge this Court to actually read what it is. I'm sorry, with respect to Dr. Houston. Mr. Flores got up here and said there was testimony about efficacy and the chit cam, and he mentioned Mr. Meyer and Janzi. Well, if you look at Integra's brief, page 10, they did mention Mr. Janzik and his testimony that the government would not permit studies on chicken embryos to be used to make inferences about toxicity. Dr. Janzik said nothing about inferences on efficacy. That is simply not true, what Mr. Flores said. Also, if you will go to the pages of Mr. Meyer. Here's the other witness who supposedly testified about chit cam and efficacy. He did not. He was asked, is data from a chit cam assay acceptable to the FDA to bear on safety issues relating to an IND application? That's all he was asked for, two pages. And he responded, I don't believe that data would have any value in substantiating data, in substantiating the safety of a substance in an IND application. Again, there is no testimony from anyone suggesting that chit cam or in vitro studies do not provide data that would be appropriate to put in an IND submission to the FDA. Thank you. Thank you, Ms. Ferry and Mr. Flores. The case is taken under submission.